UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DANIEL ANTHONY PEACE,

              Plaintiff,

v.                                                     Case No. 15-cv-276-pp

DONNA LARSON,
BRIAN GREFF, and
AMY RADCLIFFE,[1]

              Defendants.

---

**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 28), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 32), AND DISMISSING CASE**

---

The court allowed plaintiff Daniel Anthony Peace, a state prisoner, to proceed on claims under 42 U.S.C. §1983 that the defendants were deliberately indifferent to his chronic headaches when they did not allow him to keep his medication in his cell while he was on temporary lock up (TLU) status at Waupun Correctional Institution (Waupun) in October 2014. Dkt. No. 17.

On June 15, 2016, the plaintiff filed a motion for partial summary judgment. Dkt. Nos. 28-31. About two weeks later—on June 27, 2016—the defendants filed a combined motion for summary judgment and response to the plaintiff's motion for partial summary judgment. Dkt. Nos. 32-38. The court received the plaintiff's reply materials and his response to the defendants'

---

[1] The court updated the caption to reflect the correct spelling of the names of defendants Donna Larson and Amy Radcliffe. The Clerk of Court will also update the docket.

1

motion for summary judgment on August 1, 2016. Dkt. Nos. 43-48. Two weeks later, the defendants filed reply materials, which included additional proposed findings of fact. Dkt. Nos. 51-56. The plaintiff responded to those newly raised issues. Dkt. Nos. 57-59. For the reasons stated below, the court will deny the plaintiff's motion, grant the defendants' motion, and dismiss the case.

I. **RELEVANT FACTS**

The court takes the facts from the parties' submissions regarding their proposed findings of fact, including "Plaintiff's Proposed Findings of Fact" dkt. no. 30; "Defendants' Proposed Findings of Fact," dkt. no. 34; "Plaintiff's and Defendants' Undisputed Facts," dkt. no. 44; "Plaintiff's Additional Proposed Findings of Facts," dkt. no. 45; and "Defendants' Additional Proposed Findings of Fact," dkt. no. 54. The court also has considered the parties' responses and replies regarding these findings of fact. Dkts. Nos. 35, 46, 52, 53 and 59.

A. Parties

Plaintiff Daniel Anthony Peace is a state prisoner who was housed at Waupun in September and October of 2014. Dkt. No. 34 at ¶11. Waupun is a maximum security prison; it houses inmates who have committed serious crimes or have a history of violent behavior. Dkt. No. 34 at ¶2.

Defendant Amy Radcliffe is a licensed registered nurse, who from 2011 until December 2014 was employed by the Wisconsin Department of Corrections (DOC) as a Nurse Clinician 2 at Waupun. Dkt. No. 34 at ¶¶7-9.

At all times relevant to the plaintiff's claims, defendant Donna Larson was the Acting Health Services Unit (HSU) Manager at Waupun. Id. at ¶10. Her

duties included management and supervision of health care services, monitoring care plans, and monitoring nursing practice documentation in medical records. Id. She did not provide direct patient care to inmates at Waupun. Id. at ¶23.

From 2012 until 2016, defendant Brian Greff was employed at Waupun as a Corrections Program Supervisor. Id. at ¶4. In that capacity, he coordinated and supervised programs for specialized housing units. Id. at ¶3.

B.      Plaintiff's History of Headaches

When the plaintiff was a child, he was struck by an automobile, and ended up as a patient at Froedtert Memorial Lutheran Hospital. Dkt. No. 30 at ¶1. He had an abrasion-contusion with significant soft tissue swelling to the mid-forehead. Id. He had operations on his right frontal skull; the medical team sutured his chin, lower lip and nose; and he had rehab at Children's Hospital. Id.

At a later age, the plaintiff was struck by a car while riding his bike home from work. Id. at ¶2. He lost consciousness, and his pelvis bone was broken. Id. For this accident, he was a patient at St. Joseph Hospital in Milwaukee for a while, then received outpatient rehab from St. Joseph Clinic. Id.

Several years later, the plaintiff was shot in the head while driving his car. Id. at ¶3. He had two wounds in his front mid-forehead, and he injured his left hip and thigh. Id. He was treated at Froedtert, and began suffering from chronic migraines. Id. at ¶¶3-4. The plaintiff used marijuana and over-the-

counter pain medication to treat the migraines and chronic headaches. Id. at ¶¶4, 7.

On March 1, 2005, the plaintiff was taken into custody for an unrelated body warrant. Id. at ¶5. Three ten-dollar bags of marijuana were found on him, which he was using to control his chronic migraines. Id. The plaintiff was charged with possession of a controlled substance; he pled to a misdemeanor. Id. Between 2007 and 2009, the plaintiff was incarcerated; he was released to probation on March 3, 2009. Id. at ¶6. The plaintiff was taken back into custody in Milwaukee County for parole violations on October 31, 2009, and has been incarcerated ever since. Id. at ¶¶7-8. When he was taken into custody, the Milwaukee County Sheriff's Department and the Department of Community Corrections recovered thirty-three bags of marijuana, and the plaintiff was charged with possession with intent to deliver a controlled substance. Id. at ¶7.

On March 29, 2014, while he was incarcerated at the Sturtevant Transitional Facility, the plaintiff was taken to Wheaton Franciscan Hospital in Racine when he suffered a migraine headache after his forehead hit a wall. Id. at ¶9; Dkt. No. 34 at ¶25. In his discharge instructions, the physician's assistant at the hospital suggested that the plaintiff take a combination of Acetaminophen, Benadryl and Naproxen for migraines, and that he take Acetaminophen alone for headaches, as needed. Dkt. No. 30 at ¶9.

When patients are sent to outside providers, recommendations from those providers are considered recommendations to the DOC providers. Id. at

¶26. The DOC providers need to fit those recommendations to DOC and Bureau of Health Services (BHS) policies and procedures, formulary and guidelines. Id.

Between March and October 2014, the plaintiff was prescribed various medications to treat his headaches, asthma and other ailments. Id. at ¶27. His primary care providers ordered, changed and renewed his medications throughout this time. Id. This included treatment the plaintiff received at Sturtevant Transitional Facility, Racine Correctional Institution, the Milwaukee County Jail and Waupun. Dkt. No. 30 at ¶¶10-12.

At Waupun, the plaintiff wrote to HSU about his migraines, and Dr. Jeffry Manlove, M.D. prescribed Metoprolol 25 mg. twice a day. Id. at ¶13.

### C. Restrictive Housing Unit

On September 30, 2014, the plaintiff was placed on Temporary Lock Up (TLU) status while being investigated for sexual misconduct. Dkt. No. 34 at ¶11. While on TLU status, he was housed in the Restrictive Housing Unit (RHU) at Waupun, formerly known as "segregation." Id. He remained in the RHU until October 22, 2014. Id.

TLU status is a non-punitive status that allows an inmate to be separated from the general population pending further investigation or administrative action. Id. at ¶12. TLU is not considered a punitive housing status ,despite the location of TLU housing in the RHU. Id.

The RHU at Waupun is separated into three wings, or "ranges:" A, B and C. Id. ¶13. The inmates in the RHU are subject to additional rules and policies.

5

Id. While on TLU status in the RHU, the plaintiff was housed on B range in cell B-208. Id. at ¶14.

The RHU handbook, which became effective August 31, 2010, contains a policy on page 11 regarding the delivery of medication. Id. at ¶15. A and B wings in the RHU were "Control All Medication Wings," which means staff members distributed all oral medications to the individual inmate's cell. Id. at ¶16. Inmates were not allowed to possess non-control medications in their cells. Id. The rule restricting access to non-control medications was in place to eliminate the possibility of medication transfer or abuse, particularly by behaviorally unstable inmates. Id. at ¶19. The rule also was instituted as a cost-saving measure, to reduce emergency medical trips due to overdose. Id.

Inmates in the RHU can receive medications at morning, noon, afternoon and bedtime medication passes. Id. at ¶30. During these medication passes, correctional officers distribute medications to the individual inmates according to the directions on the "Medication/Treatment Record DOC-3026." Id. The correctional officers track when an inmate refuses or accepts his medications and verify that the inmate has properly ingested the medication. Id.

Inmates placed on TLU status are housed only on the A and B wings of the RHU, because the C wing generally is used for inmates who have progressed through the step process in the RHU and are at the final step before reentry into the general population. Id. at ¶¶17-18. Part of the transition back to the general population involves increased property and privileges. Id. at ¶18. Giving inmates back their non-controlled medications was part of that process.

Id. Placement of TLU status inmates on C wing would disrupt the order of the wing and the transition process for inmates who were housed in the RHU for punitive reasons. Id.

### D. Greff's Personal Involvement

Greff never created a policy prohibiting inmates on A and B wings from possessing medications. Dkt. No. 34 at ¶20. There was such a policy, but it became effective in 2010, two years prior to Greff becoming Corrections Program Supervisor in the RHU. Id. Greff never was involved in any determination regarding when the plaintiff received his medications. Id. at ¶21. Greff did not have the authority to override medication orders written by HSU staff. Id.

At some point while the plaintiff was in the RHU, Greff came to the plaintiff's cell door and introduced himself as the "Segregation Unit" supervisor. Dkt. No. 45 at ¶16. Greff told the plaintiff to contact him if the plaintiff had any problems with staff. Id. The plaintiff did not understand that Greff was Correctional Program Supervisor. Id. ¶17. He wrote to "Sgt. Brian Greff" regarding not receiving a tray. Id.

### E. Medical Care in RHU

The plaintiff was housed in the RHU from September 20, 2014 to October 22, 2014. Dkt. No 34 at ¶11. At that time, the plaintiff was prescribed six medications to assist with his headaches/migraines, asthma, and other ailments. Id. at ¶28. The medications for the plaintiff's headaches/migraines included: (1) Naproxen 500 mg. once daily as needed and provided during the

7

a.m. medication pass; (2) Acetaminophen 500 mg. twice a day as needed; and (3) metoprolol 25 mg. twice a day on a scheduled basis to prevent both headaches and high blood pressure. Id. These medications were available to the plaintiff during the a.m. and p.m. medication pass. Id. The plaintiff also received Ceirizine, an antihistamine, once daily during the a.m. medication pass. Id. The three medications used to treat the plaintiff's headaches mirrored the recommendations in the discharge instructions from the hospital: acetaminophen, a non-steroidal anti-inflammatory drug and an antihistamine. Id. at ¶29.

The plaintiff's medical records demonstrate that during his time in the RHU, he often refused medication offered to him during medication pass. Id. at ¶31. In response to this finding of fact, the plaintiff says that he took his metoprolol and acetaminophen "almost regularly during the PM medications pass," but that he "never took Naproxen" because Wheaton had advised the plaintiff to take Naproxen with acetaminophen and benidrin, but the benidrin had been discontinued. Dkt. No. 46 at 8; Dkt. No. 45 at ¶15.

On October 17, 2014, the plaintiff stopped the medication delivery officer and asked for some of his headache medication. Dkt. No. 30 at ¶15. The officer told the plaintiff that the last time he could receive any medications was during the 4:00 p.m. medication pass and that he should write to HSU. Id.

The plaintiff wrote to HSU using a Psychological Service Request form. Id. at ¶16. He wrote: "Most of the headaches I have are bad, they take place mostly between 8pm and 8AM med pass. Why won't they let me have my non-

8

control headaches meds in my cell 208-B Seg." Id. The Psychology Services Unit forwarded the request to the HSU for a response. Dkt. No. 34 at ¶32. The plaintiff submitted an identical Health Service Request the same day. Id. ¶33.

The next day, Radcliffe responded to the plaintiff's requests by informing him that he could not have medications in his cell. Id. at ¶34. Radcliffe recommended that the plaintiff try relaxation, meditation or cool compresses to relieve his headaches. Id. She personally had used these methods successfully to reduce and relieve headache symptoms. Id. ¶35. Radcliffe based her response on the fact that the RHU handbook did not allow inmates in A and B wing to have medications in their cells. Id. ¶36. She did not have the authority to override the RHU's established medication rules. Id. Nor did she, as a nurse, have the authority to overturn medical decisions or change prescription medications. Id. at ¶44-45.

After receiving Radcliffe's response, the plaintiff consulted his handbook and determined that he should follow the chain of command and write to the HSU Manager. Dkt. No. 30 at ¶18-20. On October 18, 2014, the plaintiff submitted another Health Service Request concerning his headaches; it was addressed to "Unit Manager." Dkt. No. 34 at ¶39. He wrote: "Most of my headaches are bad, they take place between 8pm and 8AM med pass. Why can't I have my non-control headache meds in my cells 208-B Seg." Dkt. No. 30 at ¶20.

Larson responded on October 20, 2014: "All medications are controlled on A + B ranges. I will schedule you with a nurse to better manage your

9

headaches. Your medications are not ordered during those times. They are ordered Am (Naproxen + AM = PM Cacelantion as needed." Id. at ¶21. As HSU Manager, Larson did not have the authority to change or alter what medications the prescriber ordered or when the plaintiff could receive those medications. Dkt No. 34 at ¶44. Nor did she have the ability or authority to override the established medication rules for the RHU. Id. at ¶46.

On October 21, 2014, a member of the HSU staff had a discussion with the plaintiff at his cell regarding his October 18, 2014 Health Service Request. Id. at ¶41. The plaintiff was informed of the medication policy in the RHU, and he was instructed to continue fluids and to try relaxation to relieve his symptoms. Id. The plaintiff disputes that he had this conversation, or at least says that he did not understand what it meant to continue fluids. Dkt. No. 46 at 10.

The plaintiff was seen in the HSU on October 27, 2014 regarding his medications, but his issue was resolved by then because he was no longer in the RHU and could maintain his non-controlled medications in his cell. Dkt. No. 34 at ¶42. The plaintiff's medication order was renewed. Id.

F.   RHU Medication Policy Change

Paul Ludvigson currently is employed as a Corrections Program Supervisor for the RHU at Waupun; he has held this position since May 2015. Dkt. No. 54 at ¶3. On March 11, 2016, Ludvigson issued a memorandum to the RHU staff informing them of a change in practice regarding the distribution of medications in the RHU. Id. at ¶4. From that point, all medications were

officer-controlled for all wings and distributed from the RHU medications cart, with the exception of medications designated or ordered by the HSU to be kept on person, or for those inmates who already had their allowed medications. Id.

On May 11, 2016, Ludvigson issued a second memorandum to the RHU staff and inmates, informing them of the transition to all medications being officer-controlled. Id. ¶5. An exception to this practice could be made if the medications were designated to be kept on person by the HSU. Id.

These changes were made with the intention of reducing the number of overdoses in the RHU. Id. ¶6. The plaintiff submitted an affidavit from another inmate who had been in the RHU on and off for a total of two years. Dkt. No. 45 at ¶19. That inmate was aware of inmates overdosing on C wing of the RHU. Id.

### G. Additional Proposed Findings of Fact

The remainder of the plaintiff's proposed findings of fact relate to his exhaustion of administrative remedies, dkt. no. 30 at ¶¶23-28, and treatment he received for his headaches after October 2014, including during a subsequent stay in the RHU, id. at ¶¶29-46, dkt. no. 45 at ¶18. The defendants, however, did not raise the issue of exhaustion in their motion for summary judgment, and the facts regarding treatment after October 2014 do not relate to these defendants and are not relevant to the plaintiff's claims in this case.

In "Plaintiff's Additional Proposed Findings of Facts," the plaintiff presents information regarding a February 9, 2015 nursing visit and his

11

subsequent communication with Larson regarding why he was charged a copay for the visit. Dkt. No. 45. Larson, as acting HSU Manager, told the plaintiff that the copay applied because he was seen face-to-face and assessed. Id. at ¶3. The plaintiff filed a complaint. Id. at ¶4.

Larson had a face-to-face meeting with the plaintiff on February 24, 2015; she assessed the plaintiff's left foot and scheduled the plaintiff to see a medical provider. Id. ¶6. Before leaving the HSU that day, the plaintiff asked Larson about the copay issue, and she advised him to write to her about it. Id. at ¶7. The plaintiff wrote to Larson that day, indicating that on February 9 the nurse had addressed the plaintiff's asthma, not his joint pain. Id. at ¶8. When another nurse responded that the plaintiff had been seen on February 24 and that the issue had been addressed, the plaintiff wrote to Larson again. Id. at ¶¶9-10.

Larson responded on February 27, 2015:

> Mr. Peace, nurses can't recommend treatment without assessing the problem. That is why you were scheduled. During your visit the [nurse] became concerned with your breathing after having you cough at night and your opening of the maintance [sic] inhaler not working. So she assessed your respiratory system. This is a face to face contact and you brough[t] up the cough at night, which is asking for help. Copay applies.

Id. ¶11. The plaintiff filed another complaint regarding the copay issue. Id. ¶¶12-14.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.  <u>Deliberate Indifference to Serious Medical Need</u>

"The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." <u>Arnett v. Webster</u>, 658 F.3d 742, 750 (7th Cir. 2011) (quoting <u>Rodriguez v. Plymouth Ambulance Serv.</u>, 577 F.3d 816, 828 (7th Cir. 2009)). "Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs." <u>Arnett</u>, 658 F.3d at 750 (citing <u>Estelle v. Gamble</u>, 4289 U.S. 97, 103 (1976)). "[A] claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." <u>Arnett</u>, 658 F.3d at 750 (citations omitted). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." <u>Rodriguez</u>, 577 F.3d at 828 (quoting <u>Estelle</u>, 429 U.S. at 103).

The defendants argue that suffering even a "painful and uncomfortable" migraine headache should not be considered an excessive risk to the plaintiff's health or safety, particularly because the plaintiff received medication for his headaches twice a day. Dkt. No. 33 at 12. Yet it is undisputed that the plaintiff had chronic migraines and headaches, and medical professionals had prescribed several medications to treat those conditions. Dkt. No. 30 at ¶9, 13; Dkt. No. 34 at ¶¶ 25-29. The court concludes that the plaintiff's migraines and headaches do constitute a serious medical need, one that "has been diagnosed

by a physician as mandating treatment . . . ." Roe v. Elyea, 631 F.3d 842, 857 (7th Cir. 2011) (quoting Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)).

The second prong of the deliberate indifference standard requires the court to determine whether Radcliffe, Larson or Greff acted with a sufficiently culpable state of mind. Although the defendants argue that none of them had sufficient personal involvement to be liable for a constitutional violation, dkt. No. 33 at 6-9, the facts indicate that Radcliffe and Larson *were* involved with the plaintiff's request to keep his headache medication in his cell, so the court will consider whether they were deliberately indifferent. The court will address the plaintiff's claim against Greff separately.

"To demonstrate deliberate indifference, a plaintiff must show that the defendant acted with a sufficiently culpable state of mind, something akin to recklessness." Arnett, 658 F.3d at 751 (quotation omitted). A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. Roe, 631 F.3d at 857. "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" Arnett, 658 F.3d at 759 (quoting Collignon v. Milwaukee Cnty., 163 F.3d 982, 988 (7th Cir. 1998)).

### 1. *Amy Radcliffe*

Radcliffe's only involvement with the plaintiff regarding this claim is her response to the plaintiff's October 17, 2014 requests to keep his headache medications in his cell in the RHU. Dkt. No. 34 at ¶¶34-36. When she received the plaintiff's request, Radcliffe either checked, or knew, that the RHU

15

handbook did not allow inmates in A and B wing to have medications in their cells. Id. ¶36. Because she did not have the authority to override the RHU's medication rules, she provided the plaintiff with methods (not medication) that she herself had successfully used to reduce and relieve headache symptoms. Id. at ¶¶35-36.

No reasonable jury could conclude that Radcliffe's response was deliberately indifferent to the plaintiff's suffering from his migraines and headaches. She provided him with care—the only care that she was authorized to provide: alternative ways to reduce or relieve his headache symptoms, which was something that was within her power and authority. The court will grant the defendants' motion for summary judgment as to Radcliffe, and will deny the plaintiff's motion for partial summary judgment.

  2. *Donna Larson*

Similarly, Larson's only involvement with the plaintiff regarding this claim was her response to his October 18, 2014 request. Dkt. No. 30 at ¶21. Larson informed the plaintiff that all medications were controlled on the A and B ranges of the RHU. Id. She also scheduled the plaintiff to be seen by a nurse to determine a better way for the plaintiff to manage his headaches. Id. Even as Acting HSU Manager, Larson did not have the authority to change or alter the medications the prescriber ordered or when the plaintiff could receive those medications. Dkt No. 34 at ¶44. Nor did she have the ability or authority to override the established medication rules for the RHU. Id. at ¶46. Though Larson did not have the authority to order those changes herself, she

scheduled the plaintiff to be seen by someone who might have that authority. There was no suggestion in the plaintiff's request that it was a medical emergency that required something other than the usual procedure to be seen by medical personnel.

The plaintiff argues that Larson's statement in 2015 that she could not recommend treatment without assessing the problem contradicts her response to his request regarding his headache medication. He maintains that Larson could look at his medications and treatment records and make changes. He also suggests that she should have assessed him before making the decision to refer him to a nurse. Finally, the plaintiff insists that Larson had "the ability to correct and alter by talking with the Institution Doctor, about an inmate's medication be[ing] prescribed at the wrong times." Dkt. No. 43 at 5.

The plaintiff's arguments are just that—arguments. He has provided no evidence in support of these contentions. He states his opinion as to what Larson could have done, or should have done, or was authorized to do. Larson's handling of the plaintiff's subsequent claim regarding his joint pain and the copay issue (which is not a medical issue) does not undermine her assertion that she did not have the power to alter RHU policy or the plaintiff's medications. Even viewing the evidence in the light most favorable to the plaintiff, no reasonable jury could conclude that Larson was deliberately indifferent to the plaintiff's migraines and headaches or his need for medication for those conditions. She *did* respond to his medical need—she scheduled him to be seen by a nurse. That response to the plaintiff's request was not "such a

17

substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Roe, 631 F.3d at 857 (quoting Sain, 512 F.3d at 894-95). The court will grant the defendants' motion for summary judgment as to Larson and deny the plaintiff's motion for partial summary judgment.

      3.    *Brian Greff*

Finally, at the screening stage, the court allowed the plaintiff to proceed on a claim that Greff created a policy regarding non-control medication which was deliberately indifferent to the plaintiff's serious medical need (a need which required that the plaintiff have access to his medication any time a headache began). Dkt. No. 17 at 10. As part of the summary judgment process, the parties submitted evidence—including affidavits and declarations. The undisputed evidence at this later stage of the case shows that Greff did not create the policy that precluded the plaintiff from keeping his non-control medication in his cell. Nor has the plaintiff submitted any evidence that he alerted Greff to his migraines or headaches or his need for medication in his cell.

Section 1983 limits liability to public employees who are personally responsible for a constitutional violation. Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009). For liability to attach, the individual defendant must have caused or participated in a constitutional violation. Hildebrandt v. Illinois Dept. of Natural Resources, 347 F.3d 1014, 1039 (7th Cir. 2003). Greff did not

participate in any violation of the plaintiff's constitutional rights. The court will grant the defendants' motion for summary judgment as to Greff.

## III. CONCLUSION

The court **DENIES** the plaintiff's motion for partial summary judgment. Dkt. No. 28.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 32.

The court **ORDERS** that this case is **DISMISSED**.

The court **DIRECTS** the clerk of court to enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30** days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28** days of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the

entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 31st day of August, 2017.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**United States District Judge**